Debra E. HALL and Michael Hall, Appellants–Plaintiffs,

v.

EASTLAND MALL; the Equitable Life Insurance Society of the United States; the Equitable Life Insurance Society of the United States d/b/a Eastland Mall; General Growth Properties; and General Growth Properties d/b/a Eastland Mall, Appellees–Defendants.

No. 82A04–0110–CV–433.

Court of Appeals of Indiana.

June 4, 2002.

Daniel E. Moore, Jeffersonville, IN, Attorney for Appellants.

Angela L. Freel, James Stoltz, Rudolph, Fine, Porter & Johnson, Evansville, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Appellants-plaintiffs Debra E. Hall and Michael Hall (the Halls) appeal a jury verdict entered in favor of the appellees-plaintiffs Eastland Mall, the Equitable Life Assurance Society of the United States (Life Assurance), *et al.* (collectively, Eastland Mall), claiming that the verdict was contrary to law and that juror misconduct occurred. Concluding that the alleged juror misconduct did not prejudice the Halls and noting that the verdict was supported by the evidence and not contrary to law, we affirm.

### *FACTS*

On January 25, 1997, the Halls, Debra's two daughters, Kaylen and Kristin, and some friends, traveled to Evansville from their Clark County residence to attend a basketball tournament over the weekend. Kristin and one of the other girls, who went with the Halls, were being recruited by the women's basketball team at the University of Evansville. Prior to the games, Debra and the other women went to Eastland Mall to shop. They arrived between 3:00 p.m. and 4:00 p.m. and parked in Eastland Mall's lot. Neither Debra nor anyone else in her party noticed any snow or ice in the lot's driving aisle.

At approximately 7:00 p.m., Debra exited the mall through the Lazarus Department Store doors and began walking up the main parking aisle until she began to cut between vehicles as she made her way toward her van. Kaylen started to walk about one step in front of Debra. At one point, Debra slipped on something slick and wet causing her to fall forward and land on her right foot. She immediately surmised that her ankle was broken. One of Debra's friends, a registered nurse, examined the injury and secured the ankle with a belt.

None of the other women observed Debra slip or begin to fall, and she did not see what caused the fall. Thereafter, it was determined that Debra probably fell on a patch of "black ice." Tr. p. 261, 640–42. While some precipitation occurred on January 24, only a "trace" amount fell on the day of Debra's injury. Appellant's App. p. 246–50.

A report prepared by Eastland Mall security personnel indicated that Debra fell on the northeast lot approximately fifteen vehicle spaces from one of the mall entrances. A security officer who investigated the incident speculated that the substance upon which Debra slipped might have been the result of a spilled drink. Tr. p. 264. The specific spot where Debra fell was at the rear of an empty parking space where a car tire or bumper would be if a vehicle had been parked in that space. When the security officer arrived, Debra's leg had already been splinted with the belt. She was then transported to the hospital in her van.

The emergency room physician observed that Debra had sustained a severe fracture and he fitted her ankle with a plaster cast. Debra underwent several surgeries and as a result of the incident, the Halls filed an amended complaint against Eastland Mall on January 25, 1999. They asserted that Eastland Mall had failed to maintain its parking lot in a safe condition at the time of Debra's fall. They also alleged that Eastland Mall was liable for damages to compensate for the injuries that Debra sustained in the fall. Specifically, the Halls alleged that Debra sustained substantial medical expenses, lost a significant amount of time from work and experienced

ongoing pain and suffering. Michael also requested damages for loss of consortium.

A jury trial commenced on June 11, 2001, and at one point during voir dire, counsel for the Halls reported to the judge at a side bar conference that one of the potential jurors appeared to have fallen asleep during questioning. Eastland Mall's counsel responded by pointing out to the court and counsel that one of the other prospective jurors also appeared to have nodded off during voir dire. The judge questioned the jurors about their ability to stay awake during the course of the trial, but the Halls' counsel did not strike the prospective juror that they assumed had been sleeping. Tr. p. 193.

During the selection of an alternate juror, possible bias among members of the panel was discovered. Tr. p. 199–200. Specifically, it was determined that one of the potential jurors had shared his thoughts about litigation with the other two alternate juror panel members. Thus, that juror and another alternate juror panel member were struck for cause following a motion made by the Halls' counsel. The Halls' counsel then used a peremptory challenge to strike a third panel member.

On the morning of June 12, the trial court's bailiff reported that Bennett, one of the jurors had "wham[med]" her jury booklet down on a table the day before and inquired as to whether it "made a difference if I've already made up my mind?" Appellants' App. p. 340. The parties stipulated to Bennett's removal and the alternate juror was made a member of the regular jury.

The judge then initiated steps to investigate Bennett's impact on the remaining jurors and solicited ideas from the parties' counsel as to how to proceed with questioning the other jurors about Bennett's remarks and conduct. Appellants' App. p. 342. The Halls' counsel proposed the jurors be individually interviewed and that they be asked about the comment Bennett had made as well as the impact of the statements that had been made during voir dire.

The trial judge then interviewed Bennett privately in his chambers. Thereafter, the jurors were then called into court where the judge questioned them individually, outside the presence of the other members to determine what impact, if any, Bennett's conduct had made upon them. Tr. p. 346–58. Counsel for the Halls propounded questions to only one of the other jurors. Thereafter, the attorneys for both parties acknowledged that the trial should resume. Tr. p. 359. Neither side made any additional record in regards to the jury selection process. Appellee's App. p. 21.

When the trial commenced, the evidence established that Eastland Mall's maintenance office is staffed twenty-four hours a day. Tr. p. 272. Personnel from Eastland Mall sweep the lot each morning, beginning at 4:30 a.m. Tr. p. 280. Specifically, it was acknowledged that the lot is cleaned with a sweeper truck and a handheld blower. In the event of snow and ice, Eastland Mall would typically notify a snow removal company for plowing and salting.

The evidence further established that the parking lot was patrolled by safety officers. Tr. p. 271. The officers checked the premises for public safety concerns and to insure the property was protected from criminal activity. Tr. p. 270. It was Eastland Mall's policy to have the safety officers report any problems that could not be immediately resolved to other Eastland Mall representatives. Tr. p. 270.

On June 13, 2001, two days after the trial commenced, the Halls moved for a judgment on the evidence with respect to Eastland Mall's defense of incurred risk.

That motion was granted, final instructions were argued and the cause was ultimately submitted to the jury. In the end, the jury returned a verdict in favor of Eastland Mall.

Thereafter, on June 25, 2001, the Halls filed affidavits with the trial court where they alleged that three jurors slept at various times during the trial. The Halls acknowledged in the affidavits that they were aware of these alleged incidents during the course of the trial, but their counsel and the court were not so informed. The Halls admitted that they waited until after the trial to inform their counsel of the events. Also on that day, the Halls filed a "Motion to Correct Errors, Motion For New Trial and Motion for Judgment on Evidence." Appellants' App. p. 116. They asserted that juror "outbursts" and the alleged sleeping incidents that occurred at the trial prejudiced them and deprived them of fairness and substantial justice. It was also pointed out that one of the jurors termed the Halls' claim as "ridiculous" during the trial, Appellants' App. p. 200, and that the judge had to awaken one of the jurors during the presentation of the evidence. Appellants' App. p. 257. In addition to these errors, the Halls alleged that the verdict for Eastland Mall could not stand because it presumed a one hundred percent fault against Debra, "in the face of an absent evidentiary record." Appellants' App. p. 140. Thus, the Halls contended that their motion for judgment on the evidence should have been granted and that the verdict was contrary to law. The trial court denied the motion to correct error and the Halls now appeal.

## DISCUSSION AND DECISION

### I. Incidents Involving Jurors

Before addressing the merits of the Halls' claims involving alleged juror misconduct and inattentiveness in this case, we note the importance of a jury trial in our judicial system. Specifically, Ind. Const. art. 1, § 20 provides that "In all civil cases, the right of trial by jury shall remain inviolate." In discussing the significance of the jury in our judicial system, one commentator has stated:

> No idea was more central to our Bill of Rights—indeed, to America's distinctive regime of government of the people, by the people, and for the people—than the idea of the jury. Yet no idea today has suffered more abuse—from benign neglect to malignant hostility to cynical manipulation and strategic perversion—than the idea of the jury.

Akhil Reed Amar, *The Constitution and Criminal Procedure: First Principles* 161 (Yale Univ. Press 1997). It is apparent that for over two centuries, lawyers have had strong incentives to aggrandize their own roles in litigation at the expense of the jury. *Id.* at 164. As a consequence, our system at times, has failed to "welcome" jurors and impress upon them, the vital role they hold in this nation's legal structure. de Tocqueville articulates the great importance of the jury to our society as a whole:

> To regard the jury simply as a judicial institution would be taking a very narrow view of the matter, for great though its influence on the outcome of lawsuits is, its influences on the fate of society itself is much greater still. The jury is therefore above all a political institution, and it is from that point of view that it must always be judged.... [The jury] should be regarded as a free school which is always open and in which each juror learns his rights.... I do not know whether a jury is useful to the litigants, but I am sure it is very good for those who have to decide the case. I regard it as one of the most effective

means of popular education at society's disposal.

Alexis de Tocqueville, *Democracy in America* 275 (Mayer ed. 1969). Unfortunately, as Amar observes, citizens tend to shirk their duty to serve on a jury "because those who do serve are too often treated shabbily in a process run by—and for the convenience of—repeat-player regulars." Amar, *supra,* at 168.

The frustration and inappropriate conduct sometimes manifested by jurors during voir dire and trial proceedings may be attributable to factors other than the jurors themselves. Indeed, Amar has gone so far as to claim that "the current state of affairs betrays the jury and the people, and that lawyers, judges, and law professors must bear much of the blame." *Id.* at 163. He goes on to observe that:

> [T]he individual juror bears all of the cost—the hassle, the inconvenience, the forgone wages—of jury service. Jury service is not just a right but a duty; predictably few of us have militantly insisted that we perform this duty. . . .
>
> . . . .
>
> When academics have publicly weighed in on jury debates in this century, it has too often been on the wrong side—trivializing the jury, mocking it, coming up with new theories for whittling away its power.

*Id.* at 165–66.

### A. Sleeping

The Halls first maintain that improper juror misconduct entitled them to a new trial. Specifically, they allege that some of the jury members slept through portions of the examination of some of the witnesses and the jury instructions. Thus, the Halls claim that those incidents require a reversal.

We initially observe that trial judges are left to use their discretion when determining whether alleged juror misconduct has prejudiced the trial process. *Fleener v. Orkin Exterminating Co.,* 560 N.E.2d 1257, 1259 (Ind.Ct.App.1990). We will not find juror misconduct until the complaining party proves to the court that the juror was actually inattentive and that such inattentiveness resulted in actual prejudice to the complaining party. *Id.* Alleged juror misconduct will not result in a new trial when the complaining party is aware of the conduct before the verdict is returned and no objection was made until after the verdict is entered. *Great Atl. & Pac. Tea Co. v. Custin,* 214 Ind. 54, 13 N.E.2d 542, 547 (1938). A contemporaneous objection is required. *Weaver v. State,* 702 N.E.2d 750, 753 (Ind.Ct.App.1998). Such a rule prevents a party from taking the chance on a verdict in his favor and then later asserting misconduct of the juror in an attempt to avoid the effect of the jury verdict. *See Monarch Buick Co. v. Kennedy,* 138 Ind.App. 1, 209 N.E.2d 922, 925 (1965); *see also New v. Jackson,* 50 Ind.App. 120, 95 N.E. 328, 332 (1911). Very recently, our supreme court clarified this rule and observed: "when a complaining party is entitled to seek a new trial, a claim of error arising from denial of a challenge for cause is waived unless the appellant used any remaining peremptory challenges to remove the challenged juror or jurors." *Merritt v. Evansville–Vanderburgh Sch. Corp.,* 765 N.E.2d 1232, 1235 (Ind.2002). This long-standing rule is also widely recognized in other states. 765 N.E.2d at 1236.

Here, the Halls failed to lodge a contemporaneous objection to the jurors' alleged misconduct. Thus, they have waived the issue. *See Weaver,* 702 N.E.2d at 753. Moreover, the Halls merely pointed out that some of the jury members had closed their eyes on occasion and have not shown

how such alleged inattentiveness resulted in any prejudice to them. Thus, there was no error.

### B. Alleged Outbursts

The Halls also maintain that the verdict must be set aside because of certain "outbursts" that were made by the jurors during voir dire and at trial. Appellants' Br. at 21–22. They contend that those incidents amounted to personal bias and prejudice against them such that the verdict may not stand.

■■ In addressing this contention, we note that once the jury has been sworn, the parties waive any objection regarding jury bias due to conduct or acts that occur during voir dire. *Hise v. State*, 452 N.E.2d 913, 914 (Ind.1983). Moreover, revelations made by jury members during the trial that are addressed by the court at that time with no objection by counsel are also waived. *Short v. State*, 443 N.E.2d 298, 306 (Ind.1982).

■ Here, the Halls concede that they "had the right to repeatedly object or seek a mistrial under these circumstances." Appellants' Br. at 22. Rather, they remained silent and hoped "that all of these peculiarities could be cured." Appellants' Br. at 22. Inasmuch as the Halls did not raise these issues in a timely fashion, they are waived on appeal.

Waiver notwithstanding, the Halls simply speculate that the jurors had not read the final instructions and could have considered some improper element in deciding the merits of the Halls' claim. Appellants' Br. at 23. In support of their claim that the jurors were biased, the Halls point to one of the jurors' comments that there were "too many personal injury lawsuits being brought these days." Tr. p. 199–201. Counsel for the Halls was afforded the opportunity to question the potential juror and he was ultimately struck from the panel for cause, along with another juror who overheard the conversation. Tr. p. 201–02, 208. Following juror Bennett's outburst where she "whammed" a notebook down on a table and indicated that she had already made up her mind about the case, the record demonstrates that each of the jurors were individually interviewed by the trial judge and by counsel. Tr. p. 346–58.

The record also demonstrates that the trial judge conducted an in camera interview of Bennett regarding her conduct and the remarks she made in the presence of the other jurors. Rather than objecting or moving for a mistrial, counsel for the Halls agreed that the case should proceed. Tr. p. 358–59. At no time did the Halls' counsel make a request to be present during the interview or to have it conducted on the record so as to preserve the issues for appeal. In light of these circumstances, the Halls may not be heard to complain at this juncture. Thus, the Halls may not succeed upon their claim that the verdict should be set aside because of juror misconduct.

Perhaps in response to instances like those that occurred at this trial, along with the observations that the commentators quoted above have made, it is noteworthy that our supreme court recently ordered the statewide adoption of Indiana Jury Rules that will become effective January 1, 2003. These new rules provide explicit guidance and directives to our trial judges and legal counsel so that the jurors might become better educated in the various aspects of our legal system generally, as well as the specific case for which they sit. The rules set forth specific standards for qualifications that must be satisfied before

a juror becomes eligible to serve,[1] and information regarding compensation, proper attire, meals,[2] confidentiality and privacy policies with respect to juror questionnaires is to be provided to the jurors.[3] Guidelines with respect to peremptory challenges and those for cause have been established.[4] The trial judge is also required to introduce the panel to the case, describe the standards of conduct that the jurors should follow, the relevant standard and burdens of proof and the anticipated course of the proceedings.[5] The rules also permit the parties to present brief statements of the facts of the case and issues with the judge's consent to facilitate the jury panel's understanding of the case.[6] The trial court may also authorize the use of juror "trial books" containing the instructions, information regarding the anticipated trial schedule, witness lists and copies of exhibits admitted for trial.[7]

Additionally, when the trial judge delivers the preliminary instructions, the jurors must be informed that they are permitted to take notes during the trial and they may seek to ask questions of witnesses by submitting the proposed inquiries in writing.[8] Jurors are also to be given copies of the written instructions before they are read to them, and they are permitted to retain those instructions during deliberations.[9] If the case has reached an "impasse," the new rules permit the trial judge, in the presence of counsel, to question the jurors and "determine whether and how the court and counsel can assist them in their deliberative process." [10]

Hopefully, these new rules will aid in educating the jurors and will promote a better understanding of their vital role within our legal system. Additionally, Hoosier jurors may very well be provided with an opportunity to reconnect with their fellow citizens and their government. Moreover, the application of the rules may communicate to jurors that their time is valued.

The jury rules may also ward off those instances of inattention and frustration that often occur in a jury trial setting. Put another way, the recent "overhaul" of the manner in which juries receive information and are treated by counsel and the courts alike, may prevent some incidents from occurring like those at this trial.

## II. Verdict as Contrary to Law and Judgment On the Evidence

The Halls next claim that the verdict for Eastland Mall was against the weight of the evidence and contrary to law. Thus, they contend that the trial court's denial of their motion to correct error, because there was an alleged lack of evidence to support the verdict, amounted to an abuse of discretion.

■■ In addressing this issue, we initially observe that the Halls are appealing from a negative judgment. Thus, we will not reverse the trial court's judgment unless it is contrary to law. *Comm'r, Dep't of Envtl. Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 559 (Ind.2001). We will consider the evidence in the light most favorable to the

1. Ind. Jury Rule 5.

2. J.R. 4.

3. J.R. 10.

4. J.R. 17, 18.

5. J.R. 14.

6. J.R. 12.

7. J.R. 23.

8. J.R. 20.

9. J.R. 26.

10. J.R. 28.

appellee and will reverse the judgment only if the evidence leads to but one conclusion and the trial court reached an opposite conclusion. *Id.* Additionally, in considering whether the trial court erred in denying the Halls' motion for a judgment on the evidence, we turn to the provisions of Ind. Trial Rule 50(A):

> [w]here all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

The mere allegation of a fall is insufficient to establish negligence, and negligence cannot be inferred from the mere fact of a fall. *Wright Corp. v. Quack,* 526 N.E.2d 216, 218 (Ind.Ct.App.1988), *trans. denied.* Additionally, to recover upon a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of care that the defendant breached, proximately causing the injury. *Deuitch v. Fleming,* 746 N.E.2d 993, 998 (Ind.Ct.App.2001). Absent factual evidence, negligence cannot be supported by an inferred chain of events. *Wright,* 526 N.E.2d at 218.

In addressing the Halls' claims, the evidence presented at trial in a light most favorable to the verdict demonstrated that no one could specifically recall that it had rained or snowed on the day of the incident. Appellants' App. p. 481, 639. There was no evidence that the drainage was inadequate on the day of the incident. Appellants' App. p. 272, 396. It was further established that Eastland Mall had a twenty-four-hour maintenance crew on duty and mall personnel swept the lot on a daily basis. Moreover, Eastland Mall maintained a contract for the removal of snow and ice. Appellants' App. p. 272, 394–95. At the time of Debra's fall, Eastland Mall security was patrolling the parking lot. Appellants' App. p. 271. Personnel at Eastland Mall acknowledged that the lighting in the parking lot was adequate, Appellants' App. p. 276, and it was established that Debra had no difficulty walking into the mall. Appellants' App. p. 639. The other witnesses had no problems walking to and from the mall and it had neither rained nor snowed while they were inside. Appellants' App. p. 640.

The substance that Debra had presumably fallen on was identified as black ice; a substance that was extremely difficult to see. Appellants' App. p. 234, 261, 640. Neither Debra nor anyone else in her party observed what she had slipped on prior to her fall. Appellants' App. p. 640. Several witnesses testified that, after the incident occurred, they almost had to get on their hands and knees to notice the black ice. Appellants' App. p. 234, 261, 640.

In light of this evidence, the evidence failed to demonstrate that Eastland Mall breached any duty to Debra that was the proximate cause of her injuries. While we are sympathetic to the Halls' plight, it was reasonable for the jury to have concluded that Debra fell and injured herself, through no fault of Eastland Mall. Thus, we decline to disturb the verdict.

Judgment affirmed.

SULLIVAN, J., and DARDEN, J., concur.