Kevin BUCKNER, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0602–CR–150.

Court of Appeals of Indiana.

Dec. 5, 2006.

Julie Ann Slaughter, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ryan D. Johanningsmeier, Depu-

ty Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Kevin Buckner appeals his convictions for Criminal Confinement,[1] a class B felony, and Battery,[2] a class C felony. Specifically, Buckner argues that his convictions must be reversed because the State failed to present legitimate racially neutral reasons for the exclusion of two African American jurors, that the trial court abused its discretion when it instructed the jurors that they could discuss the evidence prior to the conclusion of the case, and that the evidence was insufficient to support the convictions. Finding no error, we affirm the judgment of the trial court.

### FACTS

On October 4, 2005, Dama Woods was at Buckner's residence in Indianapolis. Woods began arguing with another woman who was at the house, and Buckner threatened to "tase" them with a stun gun unless they stopped yelling. Tr. p. 92. Woods eventually stopped the argument and left the residence.

Later that day, Woods returned to Buckner's house. Woods noticed that Buckner appeared "very angry," and he said "a lot of bad words." *Id.* at 94. At some point, Buckner accused Woods of stealing some of his rings. Buckner grabbed Woods's hair and began dragging her toward his garage. Buckner then used the stun gun on Woods, which made a "crackle" or "popping" sound when he used it. *Id.* at 95.

Thereafter, Buckner duct-taped Woods's hands and neck to a pole in his garage and began tasing her again. *Id.* at 100. Buckner also beat Woods with his fists. The

stun gun shocks left marks on Woods's stomach where the prongs of the gun had contact with her skin, and Buckner's punches left bruises and multiple scratches on her body. At some point, Buckner untaped Woods's hands from behind the pole and taped them in front of her. When Buckner started to take Woods from the garage to his truck, Woods began to kick him. Additionally, a $10 bill fell out of Woods's pocket and landed on the ground. When Woods was inside of Buckner's vehicle, she was able to loosen the tape. She then jumped from the truck when Buckner approached a traffic light.

Woods was able to stop Indianapolis Police Officer Kimberlee Cook's vehicle. When Officer Cook approached, she noticed that Woods was "extremely distraught, frantic," and was crying and screaming. Tr. p. 49–51. Woods was then transported to a police station where Detective John Moore questioned her about the incident. Thereafter, Woods selected Buckner's picture from a photo array that Detective Moore showed to her.

On October 6, 2005, Buckner was charged with criminal confinement, two counts of battery, and criminal recklessness. During voir dire at the jury trial that commenced on January 5, 2006, it was revealed that one of the prospective jurors—Maxine Smith—had a close family friend that had been charged with murder. It was determined that another prospective juror—Sylvia Burse—had neglected to note on her juror questionnaire that her nephew had been charged with assaulting a police officer. Thereafter, the State exercised its peremptory challenges and sought to have both Burse and Smith excluded from the jury. Buckner objected, arguing that the State was attempting to strike both jurors merely because they

1. Ind.Code § 35–42–3–3.

2. I.C. § 35–42–2–1.

were African Americans. The State responded that it was challenging Smith because the circumstances of having a close family friend charged with murder would affect her ability to impartially judge the evidence in the case. The State further argued that it sought to exclude Burse because her failure to fully disclose information that was requested in the juror questionnaire indicated deception. The trial court determined that Buckner had failed to show a prima facie case of racial discrimination because the State had not challenged two other African–American jurors that the defense had challenged, and that the State's reasons for striking both Smith and Burse were valid.

Before the evidence was presented, Buckner objected to the trial court's preliminary instruction, which indicated that the jurors could discuss the evidence during recesses in the jury room, but they were not permitted to form or express any opinions or reach any conclusion in the case until all of the evidence was presented.

In the end, the State dismissed the criminal recklessness charge, and Buckner was found guilty of criminal confinement and both counts of battery. At the sentencing hearing on January 20, 2006, the trial court merged the second battery count with the confinement conviction. As a result, Buckner was ordered to serve eighteen years for criminal confinement and six years on the remaining battery count, with the sentences to run concurrently. Buckner now appeals.

## DISCUSSION AND DECISION

### I. Peremptory Challenges

Buckner first contends that the State improperly exercised its peremptory challenges when it struck Smith and Burse from the jury. Specifically, Buckner argues that he is entitled to a new trial because the State failed to "present legitimate racially neutral reasons for the exclusion of the two African American jurors" in violation of the Fourteenth Amendment to the United States Constitution and Article One, Section 23 of the Indiana Constitution. Appellant's Br. p. 3.

In resolving this issue, we initially observe that the exercise of racially discriminatory peremptory challenges is constitutionally impermissible. *Glover v. State,* 760 N.E.2d 1120, 1125 (Ind.Ct.App.2002) (citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). To establish a prima facie case of purposeful racial discrimination in the use of peremptory challenges, a defendant must show: (1) that the prosecutor used peremptory challenges to remove members of a cognizable racial group from the jury pool; and (2) that the facts and circumstances raise an inference that the prosecutor used those strikes to exclude potential jury members from the jury because of their race. *Brown v. State,* 751 N.E.2d 664, 667 (Ind.2001). Once a prima facie case is established, the State must provide a race-neutral explanation for challenging the juror. *Id.* If the State's reason for the challenge, on its face, is based on something other than race, the explanation will be deemed race-neutral. *Forrest v. State,* 757 N.E.2d 1003, 1004 (Ind.2001). The trial court must then decide whether the defendant, as the opponent of the strike, has proven purposeful racial discrimination. *Id.* The decision as to whether a peremptory challenge is discriminatory is given "great deference" on appeal and will be set aside only if found to be clearly erroneous. *Id.*

In this case, the State first learned during voir dire that one of Smith's close friends had been charged with murder and that Burse's nephew had been charged with assaulting a police officer. Tr. p. 18–19, 20–21. As a result, the State exercised

its peremptory challenges and moved to strike both jurors. While Buckner argues that the State sought to exclude both jurors solely on the basis of race, the evidence shows that Buckner challenged the remaining potential African American jurors. Hence, because the State did not remove all of the African Americans from the jury, we agree with the trial court's determination that Buckner failed to establish even a prima facie case of racial discrimination. Moreover, even assuming solely for argument's sake that Buckner did prove a prima facie case of racial discrimination, the evidence demonstrated that Burse did not accurately answer the juror questionnaire and that Smith had a close family friend who was charged with murder, which could have affected her ability to be an impartial judge of the evidence. Under these circumstances, it is apparent to us that the State presented sufficient race-neutral reasons for challenging the two potential jurors. In other words, there has been no showing that an inference may be drawn from these circumstances that the State's exclusion of Smith and Burse was based on race. Thus, Buckner's claim fails.

## II. Jury Instruction

■ Buckner next claims that the trial court erred in instructing the jurors that they could discuss the evidence in the jury room during recesses. In essence, Buckner claims that permitting the discussion of the evidence is tantamount to premature deliberation that would improperly affect the final outcome of the case.

■ In resolving this issue, we first note that the purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind.2003). Instructing the jury is

generally within the trial court's discretion and is reviewed only for an abuse of that discretion. *Id.* at 1163–64. Instructions are to be read together as a whole and we will not reverse for an instructional error unless the instructions, as a whole, mislead the jury. *Blanchard v. State*, 802 N.E.2d 14, 32 (Ind.Ct.App.2004). A defendant is entitled to a reversal if he affirmatively demonstrates that the instructional error prejudiced his substantial rights. *Hero v. State*, 765 N.E.2d 599, 602 (Ind.Ct.App. 2002). Finally, errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise. *Stoltmann v. State*, 793 N.E.2d 275, 281 (Ind.Ct.App. 2003).

In accordance with Indiana Pattern Jury Instruction 1.01, the trial court gave the following preliminary instruction:

During the trial there will be times when you will be allowed to separate, such as recesses, rest periods, lunch periods and overnight. When you are outside the courtroom you must not talk about this case among yourselves or with anyone else. However, *you may discuss the evidence with your fellow jurors in the jury room during recesses from trial when all are present as long as you reserve judgment about the outcome of the case until the deliberations begin.*

During the trial, do not talk to any of the parties, their lawyers, or any of the witnesses.

If anyone makes any attempt to talk to you concerning this case, you should report the fact to the court immediately.

. . .

You should keep an open mind. *You should not form or express an opinion or reach any conclusion in this case*

*until you have heard all of the evidence, the arguments of counsel and the final instructions as to the law.*

Appellant's App. p. 64–65 (emphases added).

 The preferred practice is to use the pattern jury instructions. *Gravens v. State,* 836 N.E.2d 490, 493 (Ind.Ct.App. 2005), *trans. denied.* And the above-quoted instruction is reflective of one of our new jury rules that was adopted in 2003. More specifically, as of January 1, 2003, we changed our jury rules, in order to allow "trial courts to 'facilitate and assist jurors in the deliberative process . . . in order to avoid mistrials.'" *Litherland v. McDonnell,* 796 N.E.2d 1237, 1241 (Ind.Ct.App. 2003) (quoting *Tincher v. Davidson,* 762 N.E.2d 1221, 1224 (Ind.2002)). Such an "overhaul" of the jury rules may also ward off instances of inattention and frustration that often occur in a jury trial setting. *Hall v. Eastland Mall,* 769 N.E.2d 198, 205 (Ind.Ct.App.2002).

Additionally, as we observed in *Naumoski v. Bernacet,* 799 N.E.2d 58, 63 (Ind.Ct. App.2003), "in the past, jurors were treated as empty vessels that were to be filled only with the information the court, legal counsel and the witnesses provided them during the trial." We further noted that the new jury rules were promulgated to

> aid in educating the jurors and [to] promote a better understanding of their vital role within our legal system. Additionally, Hoosier jurors may very well be provided with an opportunity to reconnect with their fellow citizens and their government. Moreover, the application of the rules may communicate to jurors that their time is valued.

*Hall,* 769 N.E.2d at 198. In essence, we no longer expect or wish for our jurors to ignore the knowledge with which they enter the courtroom. Rather, we instruct them to use that knowledge. *Naumoski,* 799 N.E.2d at 63.

Notwithstanding the above, Buckner claims that the trial court improperly gave Pattern Instruction 1.01 because the words "discussion" and "deliberation" have the same meaning and, therefore, the provisions of Indiana Code section 35–37–2–6(a)(1), which prohibits juror separation once the "deliberation" has begun, were violated.

Contrary to Buckner's claim, it is apparent that Pattern Jury Instruction 1.01 clarified for the jury that there were two relevant phases of the trial and that the jurors' responsibilities differed at each phase. Specifically, the first phase commenced when the jury was in the jury room during recesses while the parties were presenting evidence and before deliberations began. Appellant's App. p. 64–65. In particular, the instruction provides that the jury should "reserve judgment" but that it could discuss the evidence without forming any opinion or reaching any conclusion in the case. *Id.* at 64–65. The second phase of the trial was to begin after the jury had "heard all of the evidence, the arguments of counsel, and the final instructions as to the law." *Id.* at 65. This portion of the instruction indicates that the deliberative process begins at this point and that the jury could then form opinions, reach conclusions, and arrive at a judgment. *Id.*

Although Buckner maintains that jurors cannot be impartial when they have discussed the case prior to deliberations, such an argument ignores the presumption that jurors are presumed to follow the instructions of the trial court. *Tormoehlen v. State,* 848 N.E.2d 326, 332 (Ind.Ct.App. 2006), *trans. denied.* Moreover, Buckner has pointed to no evidence suggesting that jurors can no longer remain impartial when they discuss the evidence prior to the actual deliberative process. In our view, such an opportunity to discuss the

evidence is reflective of the spirit and intent behind the adoption of our new jury rules. Finally, the record in this case demonstrates that the trial court instructed the jury before each recess that it was to reserve judgment until the deliberations, which were to begin following the presentation of the evidence. Tr. p. 151–52, 260. For these reasons, we conclude that the trial court did not abuse its discretion in instructing the jury that it could discuss the case prior to the close of the evidence and that giving Pattern Jury Instruction 1.01 was proper.

### III. Sufficiency of the Evidence

Finally, Buckner contends that the evidence was insufficient to support his convictions for battery and criminal confinement. In essence, Buckner claims that Woods, the sole witness who testified for the State, "demonstrated throughout the criminal investigation and the trial that she is incapable of telling the truth." Appellant's Br. p. 12. Additionally, Buckner maintains that his convictions must be reversed because the State failed to prove that Buckner committed the confinement offense with a deadly weapon and because there was no showing that Woods suffered any serious bodily injuries as the result of his conduct.

Our standard for reviewing questions of sufficiency of evidence is well known. Upon a challenge to the sufficiency of the evidence supporting a conviction, this court will not reweigh the evidence or judge the credibility of the witnesses, and we will respect the jury's "exclusive province to weigh conflicting evidence." *McHenry v. State,* 820 N.E.2d 124, 126 (Ind.2005). While considering only the evidence and reasonable inferences that support the verdict, we must decide whether there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Alexander v. State,* 819 N.E.2d 533, 540 (Ind.Ct.App.

2004). A mere reasonable inference from the evidence supporting a verdict is enough for us to find evidence to be sufficient. *Herron v. State,* 808 N.E.2d 172, 176 (Ind.Ct.App.2004), *trans. denied.* Moreover, the uncorroborated testimony of a victim is generally sufficient to sustain a criminal conviction. *Morrison v. State,* 824 N.E.2d 734, 743 (Ind.Ct.App.2005).

The only time that this court will invade the fact-finder's province to weigh evidence and judge witness credibility is in the "rare case" where the testimony is so inherently incredible or improbable that it "runs counter to human experience" and "no reasonable person could believe it." *Edwards v. State,* 753 N.E.2d 618, 622 (Ind.2001). Application of this "incredible dubiosity" rule is "limited to cases where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the defendant's guilt." *Majors v. State,* 748 N.E.2d 365, 367 (Ind. 2001), *trans. denied.*

Turning to the circumstances here, we note that to obtain a class C battery conviction as charged in Count II of the information, the State was required to prove beyond a reasonable doubt that Buckner knowingly or intentionally touched Woods in a rude, insolent, or angry manner that resulted in serious bodily injury. I.C. § 35–42–2–1. Additionally, to convict Buckner of criminal confinement as a class B felony, the State had to prove beyond a reasonable doubt that he knowingly, while armed with a deadly weapon, confined Woods without her consent. I.C. § 35–42–3–3.

In this case, Woods's testimony at trial was corroborated by physical evidence. Specifically, Woods testified that Buckner had duct-taped her hands and neck to a pole in his garage and that

she had dropped a $10 bill in the yard as Buckner dragged her from the garage to the truck. Tr. p. 96, 106. When the police conducted an investigation at the scene, they found Wood's hair on the pole in Buckner's garage near a partial role of duct tape. Additionally, one of the police officers noticed that Woods was removing duct tape from her hair and wrists, and a $10 bill was discovered in the yard where Woods indicated that it would be. State's Ex. 10–11; Tr. p. 191–92, 201. In light of the evidence that corroborated Woods's testimony, the incredible dubiosity rule is inapplicable here. Additionally, the few conflicts in Woods's testimony that Buckner identifies existed between Woods's testimony and her pretrial statements. The incredible dubiosity rule applies to conflicts in trial testimony rather than conflicts that exist between trial testimony and statements made to the police before trial. *Reyburn v. State*, 737 N.E.2d 1169, 1171 (Ind.Ct.App.2000). For these reasons, Buckner's claim that his convictions must be reversed because of Woods's alleged "incredibly dubious testimony" fails.

 Buckner also claims that his convictions must be reversed because: (1) the State failed to show that Buckner used a deadly weapon when he confined Woods; and (2) the evidence did not demonstrate that Buckner inflicted serious bodily injury upon Woods.

Indiana Code section 35–41–1–8 defines a deadly weapon as:

A destructive device, weapon, device, taser ... or electronic stun weapon ... equipment, chemical substance, or other material that in the manner it is used, or could ordinarily be used, or is intended to be used, is readily capable of causing serious bodily injury.

Additionally, Indiana Code section 35–41–1–25 defines "serious bodily injury" as

(1) serious permanent disfigurement;

(2) unconsciousness;

(3) extreme pain;

(4) permanent or protracted loss or impairment of the function of a bodily member or organ; or

(5) loss of a fetus.

At trial, Woods testified that Buckner "tased" her with a black "stun gun" that had two prongs on it. Tr. p. 95. Woods thought that Buckner had tased her nearly forty times, and the shocks "hurt really bad." Tr. p. 100. Moreover, Woods claimed that Buckner punched her several times with his fists. *Id.* at 98. The stun gun shocks left marks on Woods's stomach from where the prongs had contact with her skin, and Buckner's punches left a number of bruises and scratches on her face and other parts of her body. State's Ex. 6; Tr. p. 101–02. This evidence establishes that the stun gun that Buckner used was a deadly weapon that was readily capable of causing serious bodily injury to Woods within the meaning of Indiana Code section 35–41–1–8(2). Hence, the evidence was sufficient to support Buckner's conviction for confinement as a class B felony. Additionally, Woods's testimony that Buckner repeatedly struck her with his hands and fists, causing her severe pain and leaving marks on her body, was sufficient to support Buckner's conviction for battery as a class C felony.

The judgment of the trial court is affirmed.

NAJAM, J., and DARDEN, J., concur.