**Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before
any court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the
case.**



ATTORNEY FOR APPELLANT:

**STEVEN E. RIPSTRA**
Rispstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARK A. PETRY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 63A01-1306-CR-279 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PIKE CIRCUIT COURT
The Honorable Jeffrey L. Biesterveld, Judge
Cause No. 63C01-1201-FB-29

**February 25, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Judge**

## Case Summary and Issues

After a jury trial, Mark A. Petry was found guilty of criminal deviate conduct, a Class B felony; sexual battery, a Class D felony; and criminal confinement, a Class D felony. Petry raises two issues on appeal, which we restate as: 1) whether the trial court abused its discretion in excluding evidence regarding the witnesses' prior sexual conduct, evidence of coaching, and evidence of the living conditions at the victim's prior residence; and 2) whether there is sufficient evidence to support his convictions. Concluding the trial court did not abuse its discretion in excluding the evidence and that the evidence is sufficient, we affirm.

## Facts and Procedural History

The facts most favorable to the verdict reveal that in June 2010, Petry's fifteen year old daughter, C.P., moved into Petry's house in Huntingburg, Indiana ("Huntingburg house"). Also living at the Huntingburg house were Ca.P. (C.P.'s older sister) and Terrie Bolin (Petry's girlfriend).[1] Bolin's adult daughter Amanda Tornabeni also lived in the house for a short time.[2] C.P. and her sister had previously lived with their mother. Sometime after C.P. moved in to the Huntingburg house, Petry began touching her in ways that made her feel uncomfortable. Petry told C.P. that she was being tested to see if she could protect herself against a sexual attack. Several times Petry laid C.P. down on his bed, pulled her pants and underwear down, "put his private areas" on C.P., and touched his

---

[1] Bolin also goes by Terrie Petry. Bolin stated that she and Petry are legally married in Montana, but the marriage is not legal in Indiana. Transcript at 563. C.P. and Ca.P. both consider Bolin their stepmother. Because the parties refer to Bolin as Petry's girlfriend, we will do the same.

[2] Two of Bolin's grandchildren also intermittently lived in this house: a granddaughter, age 4, and a grandson, born in July 2011.

2

penis to her vagina. Transcript at 171. These incidents generally ran together in C.P.'s mind, but she knew there had been more than twenty instances in two years.

On one occasion, Petry used bungee cords to tie C.P to the bed. Another time, C.P. "freaked out" and hit Petry in the face while he was holding her down. Id. at 181. Petry then hit C.P. in the face fifteen times with an open hand but did not leave a mark. C.P. kept a journal during this time period, but she did not write about the abuse because she took the journal to school and did not want anyone to find out. In November 2010, C.P. wrote in her journal that Petry said she "should try sex." Id. at 259. C.P. believed that to mean Petry was telling her to "try it with him." Id. Petry never engaged in sexual intercourse with C.P. because C.P. was his daughter "and he loved her." Id. at 172. No one else was present when these attacks occurred.

C.P. trusted Bolin and told her what Petry was doing. Petry and Bolin confronted C.P. and told her that she brought it on herself because she dressed "slutty." Id. at 176. Bolin told Tornabeni multiple times that Petry and C.P. had a sexual relationship, but Bolin would not provide details beyond that C.P. would be in Petry's bedroom at night. Bolin also asked her sister, who works as a victim's services advocate in Kentucky, for the number to the Indiana Child Services hotline because of "creepy," inappropriate conduct. Id. at 277.

Bolin explained C.P. being in Petry's bedroom as instances of sleepwalking. Bolin saw C.P. straddling Petry while he was asleep, like she was trying to have sex with him. Another time, Bolin saw C.P. come into the bedroom and put her mouth on Petry's penis. Petry never woke during either of these incidents, even though Bolin had to physically remove C.P. from the bed. Ca.P. also saw C.P. in their father's bedroom. On that occasion,

C.P. sat naked on top of her father and Ca.P. had to pull her off. Ca.P. did not believe C.P. was sleepwalking. Neither C.P., nor her foster mother,[3] ever experienced C.P. sleepwalking on any other occasion. Bolin never called the police or child protective services to report these incidents. She did not seek help for C.P., nor did she install any locks to prevent C.P. from entering the bedroom again.

In October 2011, the family moved from the Huntingburg house to Pike County ("Pike County house"). The sexual contact continued at the Pike County house. There, Petry duct taped C.P.'s hands behind her back before putting her on the bed and touching her inappropriately. C.P. was in so much pain that she thought Petry must have broken her arms because of the awkward angle they were held together behind her back. Another time, Petry laid C.P. down on the bed after she had just gotten out of the shower, and while she was still naked, he "just started like blowing on [her] vagina . . . [a]nd then he put his tongue on it." Id. at 330.

The sexual contact also occurred on two occasions while Petry and C.P. were alone in a van, once while travelling from Paoli and another time while parked in a church parking lot. The instance from Paoli involved Petry using his fingers to "stimulate" her as he was driving. Id. at 234. Approximately January 2012 was the last time an incident occurred, shortly before C.P. was taken into protective custody. Petry and C.P. were in a church parking lot, and Petry asked C.P. about a boy she was dating. Petry told C.P. to prove how much she loved him, and then forced her to perform oral sex. Petry held C.P.'s

---

[3] C.P. was taken into protective custody and placed with a foster family when the Department of Child Services and Indiana State Police substantiated the reports of abuse.

"head near his lap and wouldn't let [her] move." Id. at 165. Petry did not ejaculate on that night, or any other occasion, in C.P.'s presence.

On January 18, 2012, the Indiana Department of Child Services received an anonymous report about Petry. Aaron Simpson, a family case manager, investigated the report and interviewed C.P. the same day. The Indiana State Police were notified of the complaint, and Detective Brad Chandler began an investigation. Over the course of the day, Detective Chandler spoke with Petry and Bolin separately. Petry denied any sexual contact with C.P., and Bolin stated that the only contact between the two was during the sleepwalking incidents. After Petry was arrested, Bolin called her sister and asked her to say that C.P. had told her about the abuse, but then recanted the statement because C.P. was simply mad about something her father had done when she made the claim.

On January 23, 2012, Petry was charged with criminal deviate conduct, a Class B felony; sexual battery, a Class D felony; and criminal confinement, a Class D felony. The State also filed an habitual offender enhancement. On November 26, 2012, the State filed three motions in limine to exclude evidence pursuant to Indiana Evidence Rules 402, 403, 404(b), and 412. On February 11, 2013, Petry filed his motion and memorandum in opposition to the State's motions. On March 6, 2013, the trial court granted the State's first two motions, but, after a hearing, denied the third motion except as to sexual abuse by C.P.'s former stepfather or other sexual partners. A jury trial was held across three days, and on March 8, 2013, the jury found Petry guilty as charged. Petry then pled guilty to the habitual offender charge. Petry was sentenced to twenty years for criminal deviate conduct, three years for sexual battery, and three years for criminal confinement, all to run concurrently. The sentenced was then enhanced twenty-five years for the habitual offender

5

status, for an aggregate of forty-five years. Petry filed a Motion to Correct Error on May 1, 2013, alleging a violation of the witness separation order during his trial. After a hearing, the court denied the motion. Petry now appeals.

## Discussion and Decision

### I. Exclusion of Evidence

#### A. Standard of Review

The admission or exclusion of evidence is within the sound discretion of the trial court. Redding v. State, 844 N.E.2d 1067, 1069 (Ind. Ct. App. 2006). We will reverse the trial court's determination only for an abuse of discretion; that is, where the decision is clearly against the logic and effect of the facts and circumstances before the trial court. Id. Generally, errors in the exclusion of evidence are harmless unless they affect the substantial rights of a party. Id. We will assess the probable impact of the evidence on the trier of fact to determine if an evidentiary ruling affected a party's substantial rights. Id.

#### B. Evidence of Prior Sexual Conduct, Coaching, and Living Conditions

Petry argues that the trial court erred in granting the State's motions in limine that precluded him from introducing evidence of the victim's and her sister's prior sexual conduct (including evidence of a prior molestation accusation), evidence of coaching, and evidence of the living conditions at their mother's house.

Indiana Evidence Rule 412, also known as the rape shield rule, "incorporates the basic principles" of Indiana Code Section 35-37-4-4, the rape shield act. State v. Walton, 715 N.E.2d 824, 826 (Ind. 1999). The purpose of the rape shield act and rule is to encourage reporting of sexual assaults and to prevent victims of these crimes from feeling as though they are on trial for their sexual histories. Hook v. State, 705 N.E.2d 219 (Ind.

6

Ct. App. 1999), trans. denied. To the extent there are any differences in the statute and the evidence rule, the evidence rule controls. Id. at 826 n. 5. Pursuant to Evidence Rule 412, evidence of the past sexual conduct of a victim or a witness is not admissible, except as:

1. evidence of the victim's or of a witness's past sexual conduct with the defendant;
2. evidence which shows that some person other than the defendant committed the act upon which the prosecution is founded;
3. evidence that the victim's pregnancy at the time of trial was not caused by the defendant; or
4. evidence of conviction for a crime to impeach under Rule 609.[4]

A common-law exception may also apply; "[t]his exception provides that evidence of a prior accusation of rape is admissible if: (1) the victim has admitted that his or her prior accusation of rape is false; or (2) the victim's prior accusation is demonstrably false." Oatts v. State, 899 N.E.2d 714, 721 (Ind. Ct. App. 2009).

Petry sought to introduce evidence that C.P. and her sister had accused their stepfather in 2008 of molestation occurring in 1999-2002. The charges against the stepfather were dropped before trial. Neither C.P. nor Ca.P. recanted the allegations or admitted they were false at any time. Petry wanted to introduce the evidence that C.P. and Ca.P. had made molestation allegations previously to attack C.P.'s and Ca.P.'s credibility. However, this evidence does not fit into any of the defined exceptions. It likewise is not admissible under the common-law exception: the victims never admitted that the prior accusation was false, and it is not demonstrably false.

_____

[4] Evidence Rule 412 has since been amended, and the changes came into effect Jan. 1, 2014. The relevant portion regarding exceptions in criminal cases now reads: "(A) evidence of specific instances of a victim's or witness's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence; (B) evidence of specific instances of a victim's or witness's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and (C) evidence whose exclusion would violate the defendant's constitutional rights."

Petry makes a tenuous argument that even if the evidence is not covered under an exception to the rape shield rule, he still should have been allowed to present the evidence so as not to impinge upon his rights to confront a witness and complete a full cross-examination under the Sixth Amendment and Article 1, Section 13 of the Indiana Constitution. Petry did not seek to introduce this evidence to show someone else was the perpetrator, to give a full account of his version of events, or to show that the victim had engaged in a pattern of similar sexual acts. These are some of the circumstances in which the rape shield rule has been recognized to give way to the Sixth Amendment right. Oatts, 899 N.E.2d at 722. Evidence of a prior molestation by a different person, though, is the exact type of evidence that the legislature deemed should be excluded. Id. at 723. Therefore, the trial court did not abuse its discretion in excluding this evidence.[5]

Petry also sought to introduce evidence that C.P. was coached and that C.P. had motive to lie because she wanted to return to her mother's house to live. Petry fails to develop any cogent argument to this point. He briefly states that he wanted to present the issue to go to C.P.'s credibility, but he does not offer any argument how the trial court abused its discretion in excluding the evidence pursuant to Indiana Rules of Evidence 402, 403, or 404(b). Petry thus has forfeited these claims. See Davis v. State, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005), trans. denied; App. R. 46(A)(8)(a).

---

[5] Petry also argues that he should have been able to introduce this evidence because the State opened the door when it used Detective Chandler's testimony to bolster C.P.'s testimony through partial corroboration. Petry did not object to any of Detective Chandler's statements at trial, and thus forfeits this argument. Jackson v. State, 735 N.E.2d 1146 (Ind. 2000).

## II. Sufficiency of Evidence

### A. Standard of Review

Our standard of review for a sufficiency claim is well settled. We do not reweigh the evidence or assess the credibility of witnesses. Ball v. State, 945 N.E.2d 252, 255 (Ind. Ct. App. 2011), trans. denied. We will affirm the conviction if there is probative evidence from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt. Id.

### B. Incredible Dubiosity of C.P.'s Testimony

Petry argues we should analyze the sufficiency of the evidence in this case using the "incredible dubiosity" rule:

> Under this rule, a court will impinge on the jury's responsibility to judge the credibility of the witnesses only when it has confronted "inherently improbable" testimony or coerced, equivocal, wholly uncorroborated testimony of "incredible dubiosity." Application of this rule is limited to cases . . . where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt. In such an action, an appellate court may reverse the trial court's decision.

Tillman v. State, 642 N.E.2d 221, 223 (Ind. 1994) (internal citations omitted).

Petry argues that C.P.'s testimony was inconsistent and conflicted between her statements to the DCS investigator, the child forensic investigator, and her testimony at trial. He points out that C.P.'s testimony was inconsistent as to how many times Petry hit her on the face, changing from five to fifteen, and that C.P. detailed certain acts to the investigator but could not remember them at trial. Petry argues these changes imply that C.P.'s testimony is incredibly dubious. Petry is mistaken. The incredible dubiosity rule does not apply across multiple statements; it only applies when a witness contradicts herself in a single statement while testifying. See Glenn v. State, 884 N.E.2d 347, 356 (Ind. Ct.

9

App. 2008) (the incredible dubiosity rule only applies when the witness contradicts herself in a single statement while testifying, not to conflicts between multiple statements) trans. denied; Buckner v. State, 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006) (the incredible dubiosity rule applies to conflicts in trial testimony rather than conflicts between trial testimony and statements made to police before trial). The inconsistencies in the statements go to the victim's credibility, but they do not necessarily make the testimony inherently improbable or incredibly dubious. Smith v. State, 779 N.E.2d 111, 115 (Ind. Ct. App. 2002), trans. denied. Additionally, there is no evidence or allegation that C.P.'s testimony was coerced in order to trigger the application of this rule. The incredible dubiosity rule therefore is inapplicable to C.P.'s conflicting statements. Further, Petry's remaining arguments that C.P. is not credible, has motive to lie, that there is a lack of physical evidence, and that another witness is biased, is merely an invitation to reweigh the evidence, which we will not do.

### Conclusion

Concluding that the trial court did not abuse its discretion in excluding the evidence, and that the evidence is sufficient to support Petry's conviction, we affirm.

Affirmed.

BARNES, J., and BROWN, J., concur.