## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 10 2015, 10:47 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

John D. May,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 10, 2015

Court of Appeals Cause No.
28A01-1406-CR-241

Appeal from the Greene Circuit Court.

The Honorable Erik C. Allen, Judge.

Cause No. 28C01-1402-FC-12

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, John D. May (May), appeals his conviction for intimidation, as a Class D felony, Ind. Code § 35-45-2-1(a)(1); -(b)(2)(A) (2013); criminal mischief as a Class B misdemeanor, I.C. §35-43-1-2(a)(1); battery with a deadly weapon, as a Class B misdemeanor, I.C. § 35-42-2-1(a)(3); and his adjudication as a habitual offender.

[2] We affirm.

## ISSUE

[3] May raises one issue on appeal, which we restate as follows: Whether the State presented sufficient evidence to establish his conviction for intimidation beyond a reasonable doubt.

## FACTS AND PROCEDURAL HISTORY

[4] On February 27, 2014, Debra Stephens (Stephens) lived in Linton, Indiana and was in a romantic relationship with May. That morning, after sending her two children, K.C. and R.C., to school, she ran errands with May, who had spent the night at Stephens' home. On their way back, between 1:30 and 2:30 p.m., they stopped at a liquor store to purchase beer and whiskey. Before the children returned home from school, Stephens and May had consumed "beer" and "a few shots of whiskey." (Transcript p. 227).

[5] At around 5:00 p.m., May, Stephens, and K.C. left the residence to visit a friend of May's—Stephens' son, R.C., had already left to spend the night with his friend. At May's friend's house, May continued to drink beer and whiskey. After visiting with more friends and May's grandmother, they returned home, stopping along the way to "pick up some more liquor." (Tr. p. 54). At Stephens' home, May "was really drunk" but continued to drink whiskey and beer. (Tr. p. 55). K.C. went to her room where she remained for most of the night. May asked Stephens to go to the bar with him even though he was "pretty wasted." (Tr. p. 56). Because she did not want May to get mad, Stephens agreed to drive him to the bar. She told K.C. where they were headed and instructed her to call if she needed anything.

[6] At the bar, May and Stephens continued to drink and play pool. At some point, May left the bar while Stephens was in the restroom. Still at the bar, Stephens received a phone call from K.C. telling her mother that "she was hearing noises in the house." (Tr. p. 60). Stephens immediately returned home.

[7] Meanwhile, May had walked back to Stephens' house. After entering the house, May continued drinking whiskey. He became "upset" and "started breaking windows and stuff." (Tr. p. 239). When Stephens arrived home, she saw May "breaking our [her] window." (Tr. p. 60). She entered the house and yelled at May to leave. May left through the front door. Checking on K.C., Stephens heard noises coming from the back door. Before walking to the back door, Stephens instructed K.C. to call the police if she heard more noise.

[8] By the time Stephens arrived at the back door, May had punched a hole through the door and had put his hand through the hole in an attempt to unlock the door. Although Stephens tried to block the door, she was unable to prevent May from entering the house. May "got through the door and [] came after" Stephens. (Tr. p. 68). Afraid because of all the damage done to her house, Stephens ran towards the kitchen but May "grabbed ahold of [her] hair" and pulled her "back into the laundry room[.]" (Tr. p. 69). May pinned Stephens up against the washing machine and told her "to be quiet." (Tr. p. 153). May told Stephens that "he didn't want [her] to leave him and that he'd kill [her] if [she] left him." (Tr. p. 73). Picking up a steak knife, May held it against Stephens' head. He swung at her, but she blocked him; however, the knife still left a scratch on Stephens' forehead. K.C. heard her mother say "stop, don't do it" and May replied "be quiet." (Tr. p. 153). K.C. called the police and told the dispatcher that May and Stephens were fighting and "tearing up the house." (Tr. p. 129).

[9] When Officer Chad Crynes (Officer Crynes) with the Linton Police Department arrived at Stephens' residence, he observed broken windows, blood on the damaged back door and heard screaming. Looking inside the house, Officer Crynes noticed May and Stephens "pressed up against each other." (Tr. p. 172). At that point, Officer Crynes opened the back door and announced his presence. May turned and dropped "a knife [] from his left hand." (Tr. p. 174). The officer ordered May to the ground. Stephens was "upset, crying, distraught, [and] she had blood about her hair, her face, her arms, [and] her

shirt." (Tr. p. 185). After an ambulance was called to check on May, he was arrested. Stephens' children were removed from her care and placed with the Department of Child Services (DCS).

[10] On February 28, 2014, the State charged May with Count I, intimidation, as a Class C felony; Count II, battery, as a Class D felony; and Count III, criminal mischief, as a Class A misdemeanor. On March 6, 2014, the State filed a request for habitual felon offender sentence enhancement. On April 14, 2014, the State amended its Information by adding Count IV, residential entry as a Class D felony; and Count V, battery, as a Class C felony.

[11] On May 13 through May 15, 2014, the trial court conducted a jury trial. At the close of the evidence, the jury found May guilty of intimidation, as a Class D felony, criminal mischief as a Class B misdemeanor; and battery, as a Class B misdemeanor, and adjudicated him to be a habitual offender. The jury found him not guilty of the other charges. During the sentencing hearing on May 30, 2014, the trial court sentenced Stephens to three years for intimidation, enhanced by four and one half years for the habitual offender finding, and to concurrent one hundred and eighty day sentences for criminal mischief and battery, to run consecutive to the intimidation sentence.

[12] May now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[13] May contends that the State failed to present sufficient evidence beyond a reasonable doubt to sustain his conviction for intimidation. Generally, in addressing a claim of insufficient evidence, an appellate court must consider only the probative evidence and reasonable inferences supporting the judgment, without weighing evidence or assessing witness credibility, and determine therefrom whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Glenn v. State*, 884 N.E.2d 347, 355 (Ind. Ct. App. 2008), *trans. denied*.

[14] To support a conviction of May for intimidation, as a Class D felony, the State was required to establish beyond a reasonable doubt that May communicated a threat to Stephens with the intent that Stephens engage in conduct against her will and the threat was to commit a forcible felony. *See* I.C. § 35-45-2-1. Threat is statutorily defined, in relevant part, as an expression with the intent to "unlawfully injure the person threatened or another person, or damage property." I.C. § 35-45-2-1(d).

[15] During the proceedings, Stephens testified that May had told her "to be quiet" and threatened to "kill [her] if [she] left him." (Tr. pp. 153, 73). Because only Stephens testified as to the threat made by May, May now characterizes her testimony as incredibly dubious. In support of his allegation, May asserts that Stephens "admitted she lied under oath; had to press charges against and cooperate with the prosecution of May as a condition for the return of her children; was in denial about the amount of alcohol she consumed on February

27; and admitted she could not remember aspects because she was brain dead."
(Appellant's Br. p. 15).

[16] Within the narrow confines of the incredible dubiosity rule, a court may impinge upon a jury's prerogative to judge the credibility of a witness. *White v. State*, 706 N.E.2d 1078, 1079 (Ind. 1999). If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. *Id*. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Id*. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Stephenson v. State*, 742 N.E.2d 463, 498 (Ind. 2001).

[17] Although Stephens admitted at trial that her current testimony contradicted a statement given during a prior civil protection hearing and one given during a deposition under oath, in which she both times denied going to the bar on the evening of February 27, 2014, this trial admission did not make her testimony incredibly dubious. We have previously held that the rule only applies when a witness contradicts herself in a single statement or while testifying; the rule finds no application with respect to conflicts between multiple statements. *See, e.g., Buckner v. State*, 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006) ("The incredible dubiosity rule applies to conflicts in trial testimony rather than conflicts that exist between trial testimony and statements made to the police before trial."). Reviewing Stephens' trial testimony, we note the adamancy of

her statements with respect to May's threat to kill her and we cannot find any inherent contradictions within these declarations that would propel Stephens' testimony to the realm of incredibly dubious.

[18] Nevertheless, seizing on Stephens' trial acknowledgment that she had "to cooperate with the State of Indiana in this prosecution" as a condition of getting her children back from DCS, May now asserts that Stephens' testimony was "coerced" and "wholly uncorroborated." *White*, 706 N.E.2d at 1079. However, while it is the State's prerogative to file the Information, which instigated the charges against May, and while DCS might require Stephens' cooperation in a criminal proceeding against May as a requisite for the return of her children, the record does not reflect that Stephens was coerced to specifically testify that May had threatened to kill her.

[19] Furthermore, we cannot say that Stephens' testimony was unequivocal or uncorroborated and devoid of any circumstantial evidence. K.C. testified that she heard her mother scream, with May telling her mother to be quiet. When Officer Crynes arrived on the scene, he saw May and Stephens were "pressed up against each other." (Tr. p. 172). As soon as the officer announced his presence, May turned and dropped a knife from his left hand. Officer Crynes testified that Stephens was "upset, crying, distraught, [and] she had blood about her hair, her face, her arms, [and] her shirt." (Tr. p. 185). Looking around the home, he noticed property damage and an interior in disarray.

To be sure, while Stephens' testimony contained admissions of memory lapses and there are noted discrepancies between Stephens' and her daughter's testimony, the jury was made aware of these inaccuracies through either direct or cross examination and had the opportunity to determine the veracity of each witness. Regardless of these inconsistencies, Stephens' trial testimony was consistent with regard to the threat uttered by May on the evening of February 27, 2014, and did not reflect inherent contradictions. Based on the facts before us, there is no basis to apply the incredible dubiosity rule. *See Cowan v. State*, 783 N.E.2d 1270, 1278 (Ind. Ct. App. 2003), *trans. denied* (A defendant cannot appeal to this rule by merely showing some inconsistency or irregularity in a witness's testimony.).

## CONCLUSION

Based on the foregoing, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support May's conviction for intimidation.

Affirmed.

Vaidik, C. J. and Baker, J. concur