

FILED

Oct 21 2020, 8:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony S. Churchward
Anthony S. Churchward, PC
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Allen L. Grogg,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 21, 2020

Court of Appeals Case No.
20A-CR-809

Appeal from the Allen Superior
Court

The Honorable Frances C. Gull,
Judge

Trial Court Cause No.
02D05-1906-F3-42

**Bradford, Chief Judge.**

# Case Summary

[1] In April of 2019, Teisha Gonzalez and Allen Grogg became engaged in a relationship after meeting on Facebook. After a few weeks of speaking remotely, Gonzalez and Grogg began meeting in person and discussed living together. On May 28, 2019, Gonzalez called 911 and reported that she was the victim of a domestic incident involving Grogg. A no-contact order was issued, restricting Grogg from contacting Gonzalez. Grogg was subsequently charged with and convicted of, *inter alia*, Level 5 felony domestic battery. Both prior to and during trial, the State alleged that Grogg committed contempt of court by violating and attempting to violate the no-contact order. Following trial, the trial court found that Grogg had committed four separate acts of contempt and imposed an aggregate 450-day sentence.

[2] On appeal, Grogg contends that the evidence is insufficient to sustain his Level 5 felony domestic battery conviction. He also contends that the trial court abused its discretion in imposing a 450-day sentence for his contemptuous behavior. We affirm.

# Facts and Procedural History

[3] Gonzalez met Grogg on Facebook in April of 2019. After speaking remotely for "a couple of weeks," Gonzalez met Grogg in person. Tr. Vol. II p. 61. Soon thereafter, the relationship "was getting serious" and Gonzalez and Grogg discussed the possibility of Grogg moving in with Gonzalez. Tr. Vol. II p. 61.

Gonzalez "was a little bit more hesitant" about cohabitating than Grogg. Tr. Vol. II p. 71. Grogg "was ready." Tr. Vol. II p. 71.

[4] At 1:44 p.m. on May 28, 2019, Gonzalez called 911 and indicated that "she had been in a domestic and was tased." Tr. Vol. II p. 98. Fort Wayne Police Officer Michael Bodeker responded to the dispatch. When Officer Bodeker arrived at Gonzalez's residence, he observed that Gonzalez "was angry, afraid, apologetic. She was crying. She was nervous and she was pretty fearful." Tr. Vol. II p. 98.

[5] Gonzalez informed Officer Bodeker that she and Grogg began arguing the night before about whether Grogg should move in with Gonzalez and that at some point, she fell asleep. Grogg, who "had a taser/flashlight, one end was a flashlight, the other end was a taser; he shocked her in the back and woke her up." Tr. Vol. II p. 99. When Gonzalez "got up," Grogg "tased her in the chest area over the heart." Tr. Vol. II p. 99. Gonzalez was particularly concerned about being "tased" in the chest because she "had a heart monitor … that she had just got hooked up to 'cause she was worried about some kind of heart condition." Tr. Vol. II p. 99. Officer Bodeker also observed "two little red marks consistent to a — the taser or a taser" on Gonzalez's chest. Tr. Vol. II p. 100.

[6] Before being apprehended, Grogg led police on a vehicle pursuit. Fort Wayne Police Officer Daniel Nerzig assisted in the pursuit of Grogg's vehicle and testified that upon searching Grogg's vehicle, he found a flashlight that looked

as if the edge was "machined." Tr. Vol. II p. 156. However, "[o]n closer inspection, [Officer Nerzig] found a toggle switch on the bottom, when you flipped you'd hit a button, the edge of the flashlight would activate with a spark, like an arc." Tr. Vol. II p. 156. Officer Nerzig further described the object, stating

> there's exposed metal, which is uncommon, especially with a powder—coated black flashlight. On the bottom, there's a toggle switch, on/off. Most flashlights have only a switch … only a switch that turns them on and off up here. There's an on/off switch; when the switch is depressed, it would arc.

Tr. Vol. II p. 157. Officer Nerzig indicated that he tested the "taser" portion of the object on May 28th and "it did produce a spark." Tr. Vol. II p. 157.

[7]  On June 3, 2019, the State charged Grogg with Level 3 felony criminal confinement, Level 5 felony domestic battery, Level 5 felony criminal confinement, Level 6 felony resisting law enforcement, Class A misdemeanor resisting law enforcement, Class A misdemeanor interference with the reporting of a crime, Class B misdemeanor leaving the scene of an accident, and Class C misdemeanor possession of paraphernalia. A no-contact order was issued on June 5, 2019, prohibiting Grogg from contacting Gonzalez.

[8]  On August 20, 2019, the State alleged that between June 5, 2019 and August 20, 2019, in violation of a no-contact order, Grogg (1) "contacted or attempted to contact" Gonzalez 861 times via the Allen County jail phone system and (2) contacted Gonzalez "using the messaging system at the Allen County jail."

Appellant's App. Vol. II p. 53. Citing to Grogg's violations of the no-contact order, the State subsequently filed a verified petition to revoke Grogg's bond. Following a hearing, the trial court granted the State's petition on August 29, 2019.

On January 10, 2020, the State alleged that between December 18, 2019 and January 10, 2020, Grogg had called Gonzalez 422 times and contacted her using the messaging system at the jail "nearly every day." Appellant's App. Vol. II p. 160. Following a hearing on the second contempt information, on January 14, 2020, the trial court suspended Grogg's communication privileges, except for communication with his attorney.

On January 23, 2020, the State alleged that after Grogg's communication privileges were limited to contact with his attorney on January 14, 2020, he "used another Inmate's tablet messaging to contact Dawn Prather" and asked "her to contact [Gonzalez] through another party." Appellant's App. Vol. II p. 223. The trial court conducted a hearing on the third contempt information and continued the matter until after trial.

Beginning January 28, 2020, the trial court conducted a two-day jury trial. On the second day of trial, the State filed an oral motion to dismiss the Class A misdemeanor interference with the reporting of a crime charge. The trial court granted the State's motion. Also on the second day of trial, the State alleged that Grogg "attempted again to make contact with [Gonzalez] while [Grogg] was being escorted in the hallway at the Allen County Courthouse, in the

presence of Bailiffs." Appellant's App. Vol. II p. 249. The jury acquitted Grogg of the criminal confinement charges and found Grogg guilty of the remaining charges. Following trial, the trial court also found Grogg guilty of each of the four contempt charges.

[12] On March 5, 2020, the trial court sentenced Grogg to an aggregate six-year term for his underlying criminal convictions. The trial court also sentenced Grogg to an aggregate 450-day term for his four acts of contempt and ordered that the sentence stemming from the contempt charges run "consecutive to the sentence imposed in this cause." Appellant's App. Vol. III p. 74.

# Discussion and Decision

## I. Sufficiency of the Evidence

[13] Grogg contends that the State produced insufficient evidence to sustain his conviction for Level 5 felony domestic battery.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The

> evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007) (citations, emphasis, and quotations omitted).

[14] In order to convict Grogg of Level 3 felony domestic battery, the State was required to prove that Grogg knowingly or intentionally "touche[d] a family or household member in a rude, insolent, or angry manner" and "[t]he offense [was] committed with a deadly weapon." Ind. Code § 35-42-2-1.3(a)(2) & (c)(2). Grogg does not challenge the sufficiency of the evidence to prove that he knowingly or intentionally touched Gonzalez in a rude, insolent, or angry manner. He argues only that the State failed to prove that the offense was committed with a deadly weapon.

[15] Indiana Code section 35-31.5-2-86(a) provides that "'deadly weapon' means the following:

> (2) A destructive device, weapon, device, taser (as defined in IC 35-47-8-3) or electronic stun weapon (as defined in IC 35-47-8-1), equipment, chemical substance, or other material that in the manner it:
>> (A) is used;
>> (B) could ordinarily be used; or
>> (C) is intended to be used;
> is readily capable of causing serious bodily injury.

"'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness;

(3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus."  Ind. Code § 35-31.5-2-292.

[16] The question of whether a weapon is "deadly" is determined from a description of the weapon, the manner of its use, and the circumstances of the case.  Whether an object is a deadly weapon based on these factors is a question of fact.  The original purpose of the object is not considered.  Rather, the manner in which the defendant actually used the object is examined.

*Gleason v. State*, 965 N.E.2d 702, 708 (Ind. Ct. App. 2012) (internal citations omitted).  Grogg acknowledges that "it does not matter if serious bodily injures were sustained by the crime victim, provided the defendant had the apparent ability to injure the victim seriously through his use of the object during the crime."  Appellant's Br. p. 16 (citing *Miller v. State*, 500 N.E.2d 193, 196–97 (Ind. 1986)).

[17] The State accused Grogg of using a "flashlight type electrical device that was either a 'taser' or a 'stun gun'" during the commission of the offense.  Appellant's Br. p. 16.  A "taser" is defined as "any mechanism that is:  (1) designed to emit an electronic, magnetic, or other type of charge or shock through the use of a projectile; and (2) used for the purpose of temporarily incapacitating a person."  Ind. Code § 35-47-8-3.  A "stun gun' is defined as "any mechanism that is:  (1) designed to emit an electronic, magnetic, or other type of charge that equals or does not exceed the equivalency of a five (5) milliamp sixty (60) hertz shock; and (2) used for the purpose of temporarily incapacitating a person."  Ind. Code § 35-47-8-2.  A mechanism is a "electronic

stun weapon" if the charge "exceeds the equivalency of a five (5) milliamp sixty (60) hertz shock[.]" Ind. Code § 35-47-8-1.

[18]     We have previously concluded that the evidence of the strength of shock emitted from a stun gun is not required to prove that the stun gun was used as a deadly weapon that was readily capable of causing bodily injury. In *McClellan v. State*, 13 N.E.3d 546, 549 (Ind. Ct. App. 2014), we concluded that a jury could reasonably conclude that the defendant committed battery by means of a deadly weapon, *i.e.*, a stun gun that could ordinarily be used in a manner readily capable of causing serious bodily injury, despite the fact that the State's witness "could not determine the strength of the electric shock emitted from the stun gun." Likewise, in *Buckner v. State*, 857 N.E.2d 1011, 1018 (Ind. Ct. App. 2006), we concluded that the evidence was sufficient to prove that the stun gun in question was a deadly weapon that was readily capable of causing serious bodily injury when the evidence established that the stun gun shocks left marks on the victim's skin and caused the victim to feel pain.

[19]     In this case, the evidence reveals that Grogg was in possession of an object that had a flashlight on one end and a taser or stun gun on the other. Grogg used the taser/stun gun portion of the object to shock Gonzalez twice. The first shock was to Gonzalez's back and was strong enough to awaken Gonzalez. Grogg subsequently shocked Gonzalez in the chest, near her heart. The shock left red marks on Gonzalez's skin consistent with marks made by a taser or stun gun. Gonzalez, who was under observation for a potential heart condition, was placed in fear as a result of Grogg's actions. Gonzalez expressed her fear both

to Officer Bodeker and in a text message sent to Grogg in which she told Grogg that "I hate the cops… they are a last resort and you made me so scared I had to call them!" State's Ex. 40 (ellipsis in original).

[20] While we are unable to determine from the record whether the object used by Grogg to shock Gonzalez would properly be classified as a taser or a stun gun, the object qualified as a deadly weapon because it had the apparent ability to cause serious bodily injury and Grogg acted in a manner that put Gonzalez in fear for her life. *See Merriweather v. State*, 778 N.E.2d 449, 458 (Ind. Ct. App. 2002) (providing that pellet guns or BB guns qualified as deadly weapons because "the weapons had the apparent ability to cause serious bodily injury and because they were used in a threatening manner, put the victims in fear."). As such, we conclude that the evidence is sufficient to prove that Grogg, using a deadly weapon, knowingly or intentionally touched Gonzalez in a rude, insolent, or angry manner. Grogg's claim to the contrary effectively amounts to an invitation to reweigh the evidence, which we will not do. *See Robey v. State*, 7 N.E.3d 371, 379 (Ind. Ct. App. 2014) (providing that on review, "we do not reweigh the evidence.").

## II. Sentencing

[21] Grogg also contends that the trial court abused its discretion in sentencing him. Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *modified on other grounds on reh'g*, 875 N.E.2d 218

(Ind. 2007). "An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* (quotation omitted).

[22] In arguing that the trial court abused its discretion in sentencing him, Grogg asserts that the trial court abused its discretion by imposing an aggregate 450-day sentence for his contemptuous behavior.

> Contempt is a *sui generis* proceeding neither civil nor criminal in nature, although both of those labels are used to describe certain categories of contempt. Contempt proceedings may be generally categorized as civil or criminal, according to the nature and purpose of the sanction imposed. A civil contempt is a violation of a court order resulting in a proceeding for the benefit of the aggrieved party. As such, any type of penalty in a civil contempt proceeding must be coercive or remedial in nature.
>
> By contrast, criminal contempt actions are punitive and are carried out in response to an act directed against the dignity and authority of the court which obstructs the administration of justice and which tends to bring the court into disrepute or disrespect. Accordingly, a criminal contempt sanction is punitive in nature because its purpose is to vindicate the authority of the court, and it benefits the State rather than the aggrieved party.

*Buford v. State*, 139 N.E.3d 1074, 1079 (Ind. Ct. App. 2019) (internal citations and quotations omitted).

[23] The State filed four separate contempt informations. On August 20, 2019, the State alleged that between June 5, 2019 and August 20, 2019, in violation of a

no contact order, Grogg (1) "contacted or attempted to contact" Gonzalez 861 times via the Allen County jail phone system and (2) contacted Gonzalez "using the messaging system at the Allen County jail." Appellant's App. Vol. II p. 53. On January 10, 2020, the State alleged that between December 18, 2019 and January 10, 2020, Grogg called Gonzalez 422 times and contacted her using the messaging system at the jail "nearly every day." Appellant's App. Vol. II p. 160. On January 23, 2020, the State alleged that after Grogg's communication privileges were limited to contact with his attorney on January 14, 2020, he "used another inmates tablet messaging to contact Dawn Prather" and asked "her to contact [Gonzalez] through another party." Appellant's App. Vol. II p. 223. On January 29, 2020, the State alleged that Grogg "attempted again to make contact with [Gonzalez] while [Grogg] was being escorted in the hallway at the Allen County Courthouse, in the presence of Bailiffs." Appellant's App. Vol. II p. 249. Following the underlying criminal trial, the trial court found Grogg guilty of each allegation.

[24] We have previously adopted the approach used by the Vermont Supreme Court in *State v. North*, 186 Vt. 27, 978 A.2d 435 (2009), to determine whether behavior represented separate, discrete contempts or a single contemptuous episode. *Mockbee v. State*, 80 N.E.3d 917, 922 (Ind. Ct. App. 2017). In *North*, the Vermont Supreme Court indicated that one should consider the factors of time and place and whether the offenses were motivated by a single criminal objective. *Mockbee*, 80 N.E.3d at 922 (citing *North*, 978 A.2d at 439). It is clear

from the allegations set forth in each of the informations that each was based on behavior that occurred at separate and distinct times.

[25] While the parties agree that Grogg's four contempt convictions resulted from indirect criminal contempt charges that were filed due to his repeated violations of the no-contact order and the order suspending Grogg's communication privileges, Grogg recognizes that "the four (4) Informations were filed in succession after he had been made aware of each of them." Appellant's Br. p. 21. Grogg argues, however, that because "[t]he conduct all involved the same protected person and the same conduct," the trial court "abused its discretion by ordering the four (4) separate sanctions to be served consecutively to each other." Appellant's Br. p. 21. Grogg further argues that the trial court

> could have suspended a large portion of the sentence on the condition that he not have any further contact with Ms. Gonzalez since the No Contact Order remained in effect. This would have satisfied the coercive need for punishment while furthering the remedial goal of enforcing the No Contact Order in the future.

Appellant's Br. p. 21. In raising this argument, Grogg proposed one possible punishment that the trial court could have imposed. However, he failed to cite to any authority indicating that the aggregate 450-day sentence imposed by the trial court constituted an abuse of the trial court's discretion.

[26] > The Sixth Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, guarantees to defendants in criminal cases the right to trial by jury. While petty contempts like other petty crimes may be tried without a jury,

serious criminal contempts must be tried with a jury if the
defendant insists on this mode of trial…. There is a fixed
dividing line between petty and serious offenses: those crimes
carrying a sentence of more than six months are considered
serious crimes and those carrying a sentence of six months or less
are considered petty crimes. Thus sentences up to six months
may be imposed for criminal contempts without guilt or
innocence being determined by a jury. Sentences exceeding six
months may not be imposed absent a jury trial or waiver thereof.

*Holly v. State*, 681 N.E.2d 1176, 1177–78 (Ind. Ct. App. 1997) (internal citations

omitted). Stated differently, "[s]entences exceeding six months may not be

imposed absent a jury trial or waiver thereof." *Fearman v. State*, 89 N.E.3d 435,

437 (Ind. Ct. App. 2017).

[27] In sentencing Grogg for the four separate acts of contempt, the trial court

imposed an aggregate 450-day sentence, stating as follows:

> As it relates to the contempts that were filed against you: At the
> conclusion of your jury trial, the Court found you in contempt of
> court for your willful violations of the contempt informations
> that were filed August 20th of 2019, January 10th of 2020,
> January 23rd of 2020, and January 29th of 2020. For your
> contemptuous behavior, Mr. Grogg, you are ordered committed
> to the Allen County Confinement Facility for a period of 60 days
> for the first contempt, a period of 90 days for the second
> contempt, a period of 120 days for the third contempt, and a
> period of 180 days for the fourth contempt, all to be served
> consecutive and consecutive to 02D05-1906-F3-42.

Tr. Vol. III p. 50. Grogg's guilt was determined by the trial court, not by a jury.

As such, pursuant to *Holly*, the maximum sentence that the trial court could

impose for each of the guilty findings was six months. None of the individual sentences imposed by the trial court exceeded six months.

[28] Furthermore, a defendant may be punished by consecutive sentences for multiple separate contemptuous acts so long as the acts did not arise during a single criminal trial where the trial court waited until after the conclusion of the trial to consider whether the defendant acted in contempt of court. *See generally Wine v. State*, 147 N.E.3d 409, 418–19 (Ind. Ct. App. 2020) (citing *Codispoti v. Pa.*, 418 U.S. 506, 515) (providing that when a trial judge waits until after trial to make a determination as to whether various acts of alleged contempt that allegedly occurred during the trial, the acts should be treated as one act of contempt because there is no ongoing overriding necessity for the contempt determination to preserve order during the trial), *trans. denied*. In this case, while the trial court waited until after the conclusion of Grogg's trial to determine whether Grogg's conduct constituted contempt, the no-contact order remained in effect. All of the charges included alleged distinct violations of the no-contact order, with three allegedly occurring prior to trial. Given that the no-contact order remained in place following trial, there was a risk of continued contemptuous behavior by Grogg and there was an ongoing necessity for the trial court to ensure compliance with the court's order. As such, we conclude that the trial court acted within its discretion in imposing consecutive sentences.

[29] The judgment of the trial court is affirmed.

Najam, J., and Mathias, J., concur.